Filed 6/18/21  In re Z.K. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| In re Z. K., a Person Coming Under the Juvenile Court Law. | C093220 |
| EL DORADO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. SDP20190012) |
| Plaintiff and Respondent, | |
| v. | |
| T. N., | |
| Defendant and Appellant. | |

T. N., mother of the minor (mother), appeals from the juvenile court's orders denying her petition to modify a previous order and terminating her parental rights, freeing the minor for adoption.  (Welf. & Inst. Code,[1] §§ 366.26, 388, 395.)  We affirm.

BACKGROUND

On June 5, 2019, the El Dorado County Department of Health and Human Services (Department) filed a dependency petition on behalf of the eight-year-old minor

---

[1]     Unspecified statutory references are to the Welfare and Institutions Code.

1

pursuant to section 300, subdivision (b), alleging mother failed to protect the minor when she left the minor at a motel overnight, unsupervised and alone, with no food and no means of contacting mother. The petition noted the minor's presumed father was deceased.

According to the detention report, mother planned to leave the minor alone overnight for four nights. The minor had been exposed to domestic violence and was displaying emotional issues at school. Mother denied having a substance abuse problem or engaging in domestic violence and refused the social worker's offer of alcohol and other drug services. The Department recommended mother engage in services, including counseling and parenting classes. While mother had not requested visits with the minor, the Department recommended supervised visits twice a week.

On June 6, 2019, the court ordered the minor detained with continued out-of-home placement. The court further ordered that mother be provided with alcohol and drug testing, substance abuse treatment, parenting education, and mental health counseling, as well as supervised visitation with the minor.

On July 8, 2019, the Department filed a first amended petition pursuant to section 300, subdivision (b), which added allegations regarding failure to protect the minor due to mother's repeated exposure of the minor to domestic violence between mother and her boyfriend.

The jurisdiction report noted that, in addition to the allegations in the first amended petition, mother also had untreated substance abuse and mental health problems which posed a risk to the minor. Mother reportedly entered an inpatient substance abuse treatment program at Progress House on June 25, 2019. She was drug tested and admitted to the program. Mother told the social worker she started drinking and smoking marijuana because she "could not deal" with the death of the minor's father, who was murdered in 2011. She drank with the paternal grandmother, who was an alcoholic, while the minor was in the care of the maternal grandmother. Mother stated she engaged

2

in several romantic relationships after the father's death. She stated she was the victim of domestic violence in one of those relationships.

Mother was reportedly visiting the minor twice each week. She was appropriate and engaged with the minor. Mother was offered reunification services, including individual counseling, parenting, domestic violence support, drug testing, and other drug services. On June 11, 2019, mother tested positive for marijuana and alcohol. She tested positive again for marijuana on June 19, 2019, and thereafter entered the inpatient program at Progress House. Mother reported she had an appointment to discuss with her physician the need for psychotropic medication and had placed herself on a list for transitional housing. She was searching for a sponsor and was planning to enroll in trauma-based individual counseling at Progress House when appropriate.

The Department recommended that the court sustain the allegations in the amended petition, declare the minor a dependent of the juvenile court and continue out-of-home placement, and order that reunification services be provided to mother. At the July 10, 2019 jurisdiction hearing, the court issued the recommended orders. Thereafter, at the July 17, 2019 disposition hearing, the court found mother's progress toward alleviating or mitigating the causes necessitating removal were "adequate," continued the minor's out-of-home placement, and ordered supervised visitation once weekly for four hours and permitted telephone contact with the minor. The court also appointed a special advocate (CASA) for the minor.

On October 18, 2019, the CASA filed a report stating the minor was improving greatly in foster care but still had some behavioral issues related to food and diet. The CASA believed that the minor and mother loved each other and wanted to be reunited as soon as possible and, based on mother's progress in treatment, stated support for longer or more frequent visits, continued reunification services, and transition into family maintenance. The CASA recommended the minor remain in the care of her foster

3

parents until mother was able to successfully complete treatment and transitional services.

The interim review report filed October 18, 2019, stated the minor was residing in her third resource family home but was continuing to progress and do well in school despite feeling sad and acting out on occasion. Mother completed her first treatment plan at Progress House and was working on her second when she was terminated from the program on August 5, 2019, due to "shoulder checking" another resident in the facility. Mother had been on "black-out" status when she invited her ex-boyfriend to her unsupervised weekend visit with the minor, falsely identifying him as her cousin. Mother moved back to South Lake Tahoe and was homeless until she entered an inpatient treatment program at Granite Wellness Treatment Center (Granite Wellness) in Auburn on October 2, 2019. She reported having participated in four group sessions and one individual session of outpatient services while in South Lake Tahoe before entering inpatient treatment in Auburn.

The Department reported it provided mother with individual trauma counseling, random drug testing, other drug services, parenting classes, and a 12-step program. Mother had attended one individual trauma-based counseling session and had another scheduled when she was dismissed from Progress House. She was referred to counseling in South Lake Tahoe but did not engage in those services. On October 15, 2019, mother was referred back to her previous therapist and stated she would make an appointment as soon as possible. In August and September 2019, mother submitted to random drug testing nine times and missed three tests. She tested positive for alcohol twice and marijuana three times. She denied using marijuana but neither confirmed nor denied using alcohol. She participated in five sessions but missed three sessions of other drug services at El Dorado County Mental Health. She qualified for inpatient services due to her multiple positive drug tests and was reportedly working toward her treatment goals. She was also reportedly enrolled in inpatient treatment at Granite Wellness and was

4

participating and maintaining a positive attitude. Mother participated in seven of 12 parenting classes and attended two Alcoholics Anonymous (AA) meetings.

Mother consistently participated in supervised visits with the minor; however, she was late for or missed two visits and, in September 2019, a visit was cancelled because mother smelled of alcohol and fell asleep multiple times during the visit. The minor reported mother fell asleep during an October 2019 visit, but mother claimed she was just laying down when the minor returned from the bathroom.

The Department recommended continued out-of-home placement of the minor and continued provision of reunification services to mother, concluding that, in order for the minor to be returned home, mother needed to demonstrate an ability to maintain sobriety and that she benefitted from treatment, and that she had the ability to adequately care for and supervise the minor.

The January 2020 status review report stated mother continued to participate in residential inpatient substance abuse treatment, was doing well, and was expected to move to the transitional program on January 7, 2020. Mother was working part-time and being randomly drug tested. She was also interviewing for a transitional housing program that would allow the minor to live with her for up to two years. Mother's Granite Wellness counselor reported that mother was participating in groups and maintaining a positive attitude and she had had "no relapses, no behavior problems, and no visitors." Mother had also been meeting with a trauma-based counselor on a weekly basis since November 2019 and was reportedly engaged in treatment. She attended two AA meetings but, when that conflicted with her work schedule, she began meeting with her sponsor on a weekly basis. She submitted to 13 random drug tests, missed three, tested positive for alcohol twice and tested positive for marijuana four times.

Mother continued to visit with the minor while in her residential treatment program in Auburn. She was reportedly appropriate and engaged with the minor.

5

The social worker noted that, once mother entered into inpatient treatment at Granite Wellness, she began to embrace her recovery and was committed to permanency for herself and the minor. It was anticipated that mother would complete her inpatient program on January 7, 2020, and would move directly into transitional living in Auburn and participate in outpatient services. Despite mother's progress, the Department recommended continued out-of-home placement for the minor and an additional six months of reunification services for mother with the goal of returning the minor to mother's care "within the next six months."

On January 6, 2020, the social worker received a telephone call from mother who stated she had relapsed with alcohol over the weekend. In order to enter transitional housing through Granite Wellness, mother would be required to maintain 30 days of sobriety, meaning her earliest exit date would be February 6, 2020.

At the six-month review hearing on January 15, 2020, the court continued the minor in out-of-home placement and continued mother's reunification services and ordered supervised in-person visitation.

On April 21, 2020, the housing manager at Granite Wellness reported that mother relapsed the previous night and engaged in a physical fight with another resident at the facility. The manager reported that mother was " 'belligerently intoxicated, talking in circles,' " and refused to drug test. Mother admitted she drank that day and it " 'was not the first time she had drank in the [facility].' " The sheriff arrived but did not arrest mother, who had been discharged from the facility on the evening of April 20, 2020. Mother later maintained she did not drink on April 20, 2020, or any other day while residing in the transitional housing program and claimed she told the housing manager she had been drinking so she could continue to receive services from Granite Wellness and would not lose her housing. Mother also reported she refused to drug test because she was angry the other woman involved in the altercation did not have to drug test. She denied hitting the other woman, who mother claimed had used a racial slur.

6

On April 28, 2020, the foster mother reported that, during multiple video visits with the minor, mother appeared visibly intoxicated and was slurring her words. Mother denied drinking before or during any visit and stated she may have sounded tired because she had been working double shifts.

Mother completed another drug reassessment on May 21, 2020, and it was determined she still met the criteria for outpatient services. However, on May 27, 2020, mother's outpatient counselor Laura Lagge reported that mother had been discharged from outpatient services due to her lack of participation during the month of May. Lagge reinstated mother on June 1, 2020 and, on June 30, 2020, reported that mother had been attending and actively participating in groups and meeting with Lagge weekly. Mother continued to participate in AA meetings and was referred to a therapist. She did not, however, follow up on telehealth counseling or additional trauma-based counseling. Mother completed 12 parenting classes.

At the Department's request, mother submitted to a fingernail test on June 19, 2020. The test was positive for alcohol. Mother admitted she began drinking again in mid-April while she was residing in her transitional housing program and that she was drinking approximately two to three times per week, consuming a "Four Loko and a half of a fifth of vodka." In the meantime, mother reported she completed her certified nursing assistant program, was residing in a homeless shelter in Auburn, and would be moving into an apartment in Auburn during the week of July 1, 2020.

The Department noted mother's progress had significantly declined and she continued to suffer from substance abuse that "appears to be more severe than previously understood." Noting mother engaged in some services but not others, had not benefitted enough to provide the minor with safety and stability, had not addressed the root causes of her substance abuse and trauma history, and had not shown accountability or commitment to her sobriety, the Department recommended the court terminate mother's reunification services and set the matter for a section 366.26 hearing.

Following the July 30, 2020 contested 12-month review hearing, the court found the Department provided reasonable services, terminated mother's services, and set the matter for a section 366.26 hearing finding that, while mother consistently and regularly contacted and visited with the minor, she had not made significant progress in resolving the issues that led to removal or in demonstrating the capacity and ability to complete the objectives of the case plan and provide for the minor's safety, protection, and physical and emotional well-being, and there was a substantial risk of detriment to the minor if returned to mother's care and custody.

The section 366.26 report stated that, since visits were reduced to twice monthly on July 30, 2020, mother attended visits but she and the minor watched movies and television the majority of the time. On August 11, 2020, the minor was placed with relatives. On September 17, 2020, the minor told the visitation supervisor she did not want to visit with mother. Several days later during a home visit by the social worker, the minor began sobbing and stated she did not want to go to her final visit with mother because the last time they were together, mother's " 'face looked different' " and was " 'puffy' " like someone who " 'drinks a lot' " and mother was " 'mean' " to her. The minor refused to visit with mother on October 1, 2020, and began sobbing again. At another home visit on October 5, 2020, the minor became tearful and repeated that mother's face looked " 'puffy.' " When asked if she would prefer video or telephone visits with mother rather than in-person visits, the minor was unable to give a clear answer. When the social worker offered to call mother during the home visit, the minor said, " '[N]o thank you.' "

The Department noted that, while mother and the minor shared a bond, "they do not share a healthy attachment" because the minor "is parentified, has historically cared for herself during her mother's absences and has worried about her mother's well-being and happiness while she has been placed in out of home care." The social worker reported that, during a home visit, the minor stated, " 'I wanted to be in foster care

8

because then I knew my mom would still be alive' " and stated that she worried mother might drink so much that she would not wake up.  The Department also noted that, while visits between mother and the minor generally went well, mother had to be reminded many times to follow visitation protocol and not discuss case-related information with the minor; some visits had to be terminated due to mother falling asleep and appearing visibly intoxicated during video visits; and mother frequently came to visits unprepared (e.g., she did not bring lunch to a visit from 10:30 a.m. to 2:30 p.m.) despite reminders from the visitation supervisors.  The Department concluded the minor was adoptable and recommended termination of mother's parental rights with a permanent plan of adoption.

I

*Section 388 Petition*

On October 22, 2020, mother filed a petition pursuant to section 388 requesting that the court reinstate her reunification services.  The petition alleged mother had "remained clean and sober and completed her outpatient program" and the requested change would be in the minor's best interest because the minor "would be able to have a real parent child relationship with her mother."

II

*Hearing On Section 388 Petition/Section 366.26 Hearing*

The hearing on mother's section 388 petition and the contested section 366.26 hearing commenced on November 19, 2020.  Mother's therapist, Deborah Stevenson, testified she had been working with mother since November 8, 2019, during which time mother was consistent in attending sessions.  Stevenson testified she worked with mother on trauma history, including the death of the minor's father, teaching mother mindfulness skills and coping strategies, and addressing her daily concerns.  Stevenson discussed issues with mother including employment, which was very important to mother, and housing, which was reportedly stable.  Stevenson had been to mother's home for therapy sessions and noted the home was neat, clean, fit, and livable.  Stevenson testified

9

mother's progress had been "somewhat slow and interrupted by the COVID situation and not being able to connect for a few weeks." She estimated mother would need another six months of therapy.

Next, the maternal grandmother testified she routinely dropped in on mother three to four times per week to make sure mother was okay and, since July 2020, she had not seen any evidence that mother was drinking or using drugs. Grandmother testified that mother was participating in AA on a regular basis and had been working at a nursing home for several months. Grandmother participated in several visits between mother and the minor and observed them to interact "quite well."

Mother testified she never completed a psychotropic medicine evaluation and she was never given a referral to do so. She testified she consistently participated in counseling with Stevenson and completed a parenting program. She also completed an inpatient rehabilitation program in January 2020 through Granite Wellness but relapsed in April 2020. She went to AA meetings, stayed in contact with her sponsor, and stayed focused on her coping skills in order to regain her sobriety at the beginning of May 2020. She had another relapse in June 2020, after which she went to AA meetings, went to therapy, did outpatient treatment, and stayed in contact with safe and sober people to regain her sobriety. She eventually graduated from outpatient treatment. Mother testified she had not had any alcohol or drugs since her last relapse. She testified she participated in AA three times a week both in person and by video. Mother also testified regarding the minor's emotional challenges and how the minor communicated with her about school problems and other issues.

Social worker Jennifer Pera testified having had three conversations with the minor (on September 22, 2020, October 5, 2020, and November 19, 2020) during which Pera discussed the possibility of adoption with the minor. The minor stated she was "very excited to spend the rest of her birthdays with her foster family," she "wanted to live with them forever," and she "was excited about adoption." Pera explained to the

minor that adoption meant she would no longer have court-ordered visitation with mother and would likely not see mother for a long time. Pera testified the minor stopped wanting to visit mother after the second visit. Pera asked the minor if she wanted to ask the court for a goodbye visit if the court decided adoption was appropriate and the minor said, " 'No.' " Pera also asked if the minor wanted to call mother. The minor declined and confirmed she wanted the court to order adoption.

After taking the matter under submission, the court, on December 3, 2020, denied mother's section 388 petition, found the minor adoptable, and terminated parental rights.

Mother timely appealed the court's December 3, 2020 orders.

DISCUSSION

I

*Denial Of Section 388 Petition*

Mother contends the juvenile court abused its discretion when it denied her section 388 petition. She claims there was sufficient evidence of changed circumstances based on her completion of an outpatient rehabilitation program and schooling, change of attitude and commitment to recovery, securing housing, participation in trauma-based counseling, and 150 days of sobriety. She further claims she demonstrated reinstatement of reunification services would be in the minor's best interest.

The Department argues mother's circumstances were, at best, changing because her positive efforts were recent and, in any event, her request for additional reunification services would only serve to delay the minor's permanency and therefore did not promote the minor's best interests. As we explain, the juvenile court did not err in denying mother's section 388 petition.

A petition to change or modify a juvenile court order under section 388 must factually allege that there are changed circumstances or new evidence to justify the requested order, and that the requested order would serve the minor's best interests. (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) The petitioner has the burden of proof on

11

both points by a preponderance of the evidence. (Cal. Rules of Court, rule 5.570(h)(1)(D).)

To decide whether a parent has met his or her burden under section 388, the juvenile court must consider such factors as the seriousness of the problem that led to the dependency, and the reasons for the problem's continuation; the degree to which the problem may be and has been removed or ameliorated; and the strength of the relative bonds between the dependent child and the child's parents or caretakers. However, this list is not exhaustive. (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1229.)

When reunification services have been terminated and a section 366.26 hearing has already been set, a court assessing the child's best interests must recognize the focus of the case has shifted from the parents' interest in the care, custody, and companionship of the child to the needs of the child for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The child's best interests "are not to further delay permanency and stability in favor of rewarding" the parent for his or her "hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.) "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) In assessing the petition, the court may consider the entire history of the case. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

We review the denial of a section 388 petition for abuse of discretion. (*In re S.R.* (2009) 173 Cal.App.4th 864, 870; *In re J.T.* (2014) 228 Cal.App.4th 953, 965.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M., supra*, 7 Cal.4th at pp. 318-319.)

Here, mother's petition requested that the court reinstate her reunification services. She argued changed circumstances based on the fact that she "has remained clean and sober and completed her outpatient program," and she argued the requested change was in the minor's best interest because the minor "would be able to have a real parent child relationship with her mother." She also attached a certificate of completion of an outpatient program (dated October 12, 2020) and confirmation of the dates she met with Stevenson for trauma-based therapy. At the hearing on her petition, mother offered testimony that she participated in trauma-based therapy; completed a parenting program, an inpatient rehabilitation program, and an outpatient treatment program; participated in AA; maintained employment and a stable, clean home; consistently visited and interacted well with the minor; and had been clean and sober since her last relapse in June 2020.

Mother's progress after her reunification services were terminated on July 30, 2020, while laudable, demonstrated her circumstances were, at best, changing. The minor was removed in June 2019 due to the fact that mother had left her home alone, overnight, with no food and no way to contact mother, something mother reportedly did often. Mother exposed the minor to domestic violence in the home and struggled with untreated mental health problems as well as substance abuse issues (namely, alcohol) which proved to be more serious than initially thought, as demonstrated by her various admitted relapses.

Mother argues, and we do not doubt, that relapse is a common occurrence on the difficult road to sobriety. She points to the fact that she had five months of sobriety as of the July 30, 2020 hearing as evidence her circumstances had changed. Again, while mother's period of sobriety is commendable, the record makes plain that her circumstances were changing, not changed. Mother tested positive for alcohol early in the proceedings and entered inpatient treatment at Progress House. She completed her first treatment plan but was terminated from the program on August 5, 2019 when she "shoulder check[ed]" another resident and invited her ex-boyfriend to her unsupervised

13

weekend visit with the minor. In August and September 2019, she tested positive for alcohol twice (and tested positive for marijuana three times) and missed several sessions of other drug services. She enrolled in inpatient treatment at Granite Wellness and attended AA meetings but had a supervised visit cancelled in September 2019 because she smelled of alcohol and repeatedly fell asleep during the visit. She relapsed in early January 2020. In April 2020, she was discharged from Granite Wellness after she engaged in a physical fight with another resident, was " 'belligerently intoxicated [and] talking in circles,' " refused to drug test, and she admitted she consumed alcohol the day of the fight and had done so previously while at the treatment facility. She later denied drinking the day of the fight or any other time while at Granite Wellness. In late April 2020, the foster parent reported mother was slurring her words and appeared visibly intoxicated during multiple video visits with the minor. Again, mother denied drinking. She was discharged from outpatient services on May 27, 2020 due to her lack of participation. She was subsequently reinstated in early June 2020; however, on June 19, 2020, she tested positive for alcohol and admitted she began drinking again in mid-April while she was residing in her transitional housing program and that she was drinking approximately two to three times per week. Then, while testifying at the hearing on her section 388 petition, she denied having made those previous admissions. At best, mother showed her circumstances were changing.

We similarly reject mother's claim that reinstatement of reunification services was in the minor's best interest. In order to determine the minor's best interests, a court examines "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.) Mother claims she demonstrated the problems necessitating the minor's removal were "not too serious to

14

correct," she and the minor had a strong bond, and she had ameliorated the problems by completing the various services, maintaining employment, obtaining housing, and creating a sober support network. We disagree.

As the Department reported, it became increasingly clear that mother's issue with alcohol abuse was "more severe than previously understood." There is no question the issue was serious and, as previously discussed, challenging in terms of achieving and maintaining sobriety. Again, while mother was making laudable progress, the problem was by no means removed. Similarly, mother's serious mental health issues (including past trauma) contributed to her behavior leading to removal of the minor and therefore required treatment. While mother had been attending trauma-related therapy with some consistency, her therapist testified mother would need another six months of counseling. The record demonstrates the issues leading to dependency were serious and continuing.

The record also makes plain that the bond between mother and the minor was tenuous at best. The court noted the social worker's reports and mother's testimony demonstrated that, while mother and the minor shared a bond, they did "not share a healthy attachment, based in large part on Mother's alcohol abuse and [the minor] having been placed in the role of caregiver to Mother." The minor had been removed from mother's care and custody for over one year and was ultimately placed with relatives on August 11, 2020. Thereafter, she resisted visits with mother, stating more than once that mother's " 'face looked different' " and was " 'puffy' " like someone who " 'drinks a lot' " and mother was " 'mean' " to her. The minor also expressed her desire to be adopted by her foster adoptive parents.

Lastly, we do not agree with mother's claim that the problems which led to the dependency were removed or ameliorated. It is true that mother completed her parenting classes and inpatient treatment, was participating in trauma-based therapy and AA meetings, and had secured housing and employment. However, we cannot ignore that the benefit of each of those accomplishments was and is wholly reliant on mother's ability to

15

achieve and maintain sobriety, an issue which, as previously discussed at length, has yet to be removed or ameliorated.

We conclude the court did not abuse its discretion in denying mother's section 388 petition.

## II

### *Beneficial Parental Relationship Exception*

Mother contends the juvenile court erred when it found the beneficial parental relationship exception to adoption did not apply. We disagree.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(1) [beneficial parental relationship exception]; *In re Caden C.* (2021) 11 Cal.5th 614.)

The party claiming the exception has the burden of establishing the existence of any circumstances which constitute an exception to termination of parental rights. (*In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1372-1373; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2); Evid. Code, § 500.)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) The parent must also

16

prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, at p. 575.) On the other hand, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 634; *In re Autumn H.*, at p. 575.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent[-]child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent[-]child bond." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575-576.)

The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-640; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*In re Caden C.*, at pp. 639-640.) The specific elements of this statutory exception require a close examination of "the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id.* at p. 614.) "When it weighs whether termination would be detrimental, the court is not

comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) "[C]ourts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Ibid.*)

Here, there was substantial evidence to support the court's finding that the beneficial parental relationship exception did not apply.

Mother claims she visited regularly and consistently with the minor until August 11, 2020, when the minor was placed with relatives and refused any further visits. There is little dispute that mother maintained regular visitation with the minor. However, even frequent and loving contact is not sufficient to establish this benefit absent a significant positive emotional attachment between parent and child. (*In re I.R.* (2014) 226 Cal.App.4th 201, 213.) Mother asserts she demonstrated the minor would benefit from continuing the relationship by presenting evidence of the quality of her visits with the minor, her insight into the minor, and her ability to provide support and encouragement to the minor, as well as the mutual affection and interaction between the two until August 11, 2020. Even assuming mother met the first prong of the beneficial parental relationship exception, there was no evidence to establish the minor had such a "substantial, positive, emotional attachment" to mother such that the minor would benefit from continuing the relationship or be harmed to any significant extent should the attachment be severed. (*In re Caden C.*, *supra* 11 Cal.5th at pp. 634-636.)

While many of mother's visits with the minor were appropriate, with the minor reportedly excited to see mother and happy to spend time with her, the quality of visits overall varied. For example, there were multiple video visits during which mother appeared visibly intoxicated and was slurring her words. Some visits had to be terminated due to mother falling asleep. This was difficult for the minor, who had disclosed to the social worker that she worried mother would drink so much she would

18

not wake up. Oftentimes mother had to be reminded to follow visitation protocol and not discuss case-related information with the minor, and she frequently came to visits unprepared, including failing to bring lunch for the minor, despite reminders from the visitation supervisors. Following a reduction in mother's visits after the July 30, 2020 hearing, mother continued to attend visits but tended to watch movies and television with the minor the majority of the time.

In September 2020, the minor became upset prior to visits stating she did not want to visit with mother because, during a previous visit, she thought mother's " 'face looked different' " and was " 'puffy' " like someone who " 'drinks a lot' " and mother was " 'mean' " to her. The minor repeatedly became upset and refused to visit with mother, and she declined an offer to connect with mother by telephone.

Moreover, the minor was comfortable and doing well in the home of her extended relatives, she was "very excited to spend the rest of her birthdays with her foster family," she "wanted to live with them forever," and she "was excited about adoption." She was disappointed that the court process took so long and worried it would take even longer because mother was not in favor of adoption. When the social worker explained that adoption meant the minor would no longer have court-ordered visitation with mother and would likely not see mother for a long time, the minor declined offers to visit or call mother and confirmed she wanted the court to order adoption.

Mother argues the fact that the minor had spent most of her life with mother before she was detained at eight years old affected the bond between them. That fact cuts both ways. While there was a parent-child bond between the two during the first eight years of the minor's life, the minor was also exposed to domestic violence involving mother; she was parentified and had to learn to care for herself while she worried about her mother; and she was often left to fend for herself. She grew to understand mother's problem with alcohol and was able to recognize when mother was intoxicated based on how mother looked and behaved. Again, even assuming a bond between mother and the

19

minor, there was a dearth of evidence to demonstrate that severing the bond would be detrimental to the minor.

There was sufficient evidence to establish mother's visitation and contact with the minor did not promote the minor's well-being to such a degree as to outweigh the well-being the minor would gain in a permanent home with her adoptive parents (see *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575) and it was reasonable for the juvenile court to find it was in the minor's best interest to terminate parental rights and select a permanent plan of adoption.

The juvenile court did not err in finding the beneficial parental relationship exception to adoption did not apply.

DISPOSITION

The juvenile court's orders are affirmed.


/s/
Robie, Acting P. J.


We concur:


/s/
Murray, J.


/s/
Duarte, J.